UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
HARTFORD FIRE INSURANCE CO. a/s/o
Klearwall Industries, Inc.,

                       Plaintiff,                    18-cv-121 (PKC)

      -against-                        OPINION
                                        AND ORDER

MAERSK LINE, a division of the A.P. Moller-
Maersk Group, ALBATRANS INC. and XYZ
CORP.,

                      Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        This case arises out of a shipment of glass doors and windows that arrived in damaged condition after being transported from Cork, Ireland to Connecticut.  Discovery is now closed.  Defendants Maersk Line ("Maersk") and Albatrans Inc. ("Albatrans") each moves for summary judgment pursuant to Rule 56, Fed. R. Civ. P.

        Maersk's motion is directed solely toward damages.  It urges that plaintiff's recoverable damages are limited to $500 per "package" under the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 ("COGSA"), and that because the bills of lading identify two containers as "packages," its damages are limited to a total of $1,000.

        Albatrans moves for summary judgment as to its liability under COGSA.  It asserts that it was retained solely to make freight-forwarding arrangements and provide for customs clearance.  It urges that because it performed limited duties as a freight forwarder, and did not act as a non-vessel operating common carrier ("NVOCC"), it cannot be liable under COGSA.

As will be explained, Maersk has failed to demonstrate that its bills of lading reflect an agreement between the shipper and carrier to treat the two shipping "containers" as "packages."  Because Maersk has not satisfied its burden as summary judgment movant to demonstrate its entitlement to judgment as a matter of law on the number of COGSA "packages," its motion will be denied.  Albatrans, however, has come forward with evidence that it functioned as a freight forwarder, and, in opposition, Hartford has not offered evidence that would permit a reasonable trier of fact to conclude that Albatrans acted as a NVOCC or is otherwise liable under COGSA.  Albatrans's motion will therefore be granted.

BACKGROUND.

This action arises from a shipment of glass doors and windows that arrived in damaged condition after being transported from Cork, Ireland to Stratford, Connecticut via the Port of Newark.  (Maersk 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; Albatrans 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)[1] The shipment was ordered by non-party Klearwall Industries, LLC ("Klearwall").  (Albatrans 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  Klearwall insured the shipment through plaintiff Hartford Fire Insurance Co. ("Hartford"), which is the subrogated insurer.  (Albatrans 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13.)  Hartford seeks $306,702.02 for the damage that allegedly occurred during the shipping process.  (Maersk 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)

Klearwall retained defendant Albatrans to act as the shipment's customs broker.  (Albatrans 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  Klearwall authorized and instructed Albatrans to effectuate customs clearance and the release of the glass shipment into the United States, as well as to arrange for the shipment's ocean transport.  (Albatrans 56.1 ¶¶ 4-5; Pl. 56.1 Resp. ¶¶ 4-5.)  Albatrans, in turn, arranged for non-party Interocean Agencies Ltd. ("Interocean"), a Dublin-

---

[1] Citations to the parties' Rule 56.1 statements refer to the evidence cited in those statements.

based freight-forwarding company, to book the shipment's ocean transit.  (Albatrans 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  Interocean then retained defendant Maersk to provide ocean carriage, and Maersk issued two bills of lading that consigned the shipments to Albatrans.  (Albatrans 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7; Chiarelli Dec. Ex. D.)  One Maersk bill of lading identified "1 Container said to Contain 102 pieces" and the second identified "1 Container Said to Contain 160 PIECES."  (Chiarelli Dec. Ex. D.)  Albatrans also arranged for Sapsan, LLC to make inland delivery to the shipment's final destination.[2]  (Albatrans 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)

Albatrans and Klearwall have done business together since 2011, and it has been routine for Albatrans to arrange for the trucking of cargo from the port of delivery to a warehouse designated by Klearwall.  (Albatrans 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  Albatrans does not itself own or operate trucks or ocean vessels.  (Albatrans 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)

The summary judgment record does not purport to include evidence about where and how the glass shipment incurred physical damage.  In Ireland, Munster Joinery loaded the containers, and Maersk did not vouch for the containers' contents.  (Albatrans 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Pursuant to the two bills of lading, Maersk was to provide two empty 45-foot containers, and it had no contractual responsibility for loading and securing the containers' contents.  (Maersk 56.1 ¶¶ 6-7; Pl. 56.1 Resp. ¶¶ 6-7; Wang Dec. Exs. 1, 2.)  Maersk had no personnel present when the containers were loaded, and Maersk's responsibilities were limited to the ocean transport of the loaded containers from Cork to Newark.  (Maersk 56.1 ¶¶ 8-9; Pl. 56.1 Resp. ¶¶ 8-9.)  Maersk's role in the transport ended when the containers arrived at the port in Newark, New Jersey.  (Maersk 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)

---

[2] The Complaint named Sapsan as a defendant, but the Court dismissed the claims against it for lack of personal jurisdiction. Hartford Fire Ins. Co. v. Maersk Line, 2019 WL 4450639 (S.D.N.Y. Sept. 17, 2019).

There is no dispute that the Maersk bills of lading are evidence of contracts for the carriage of goods by sea to or from ports of the United States in foreign trade within the meaning of COGSA, 46 U.S.C. § 30701.  (Maersk 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d

79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor

of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

DISCUSSION.

      I.        <u>Maersk's Motion for Partial Summary Judgment Will Be Denied.</u>

           A.   <u>Hartford's Reliance on the Fair Opportunity Doctrine Is Unavailing.</u>

      Maersk and Hartford agree that COGSA governs any damages award.  (Maersk

56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4; Opp. Mem. at 7.)  Maersk urges that the plain language of the bills

of lading demonstrates that the two containers carrying the Klearwall shipment were "packages,"

as that term is used in COGSA, each of which has a damages cap of $500, for a total damages

award of $1,000.

      COGSA provides that "[t]his Act shall apply to all contracts for carriage of goods

by sea to or from ports of the United States in foreign trade."  COGSA § 13.[3]  Under COGSA,

"[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to

or in connection with the transportation of goods in an amount exceeding $500 per package

lawful money of the United States . . . ."  COGSA § 4(5).

      As a threshold matter, Hartford argues that the motion should be denied because

there are factual disputes as to whether the $500 limitation applies under the "fair opportunity

doctrine."  "Under the 'fair opportunity' doctrine . . . the [$500] COGSA limit is inapplicable if

the shipper does not have a fair opportunity to declare higher value and pay an excess charge for

---

[3] "COGSA was previously codified at 46 U.S.C. §§ 1300-1315.  In 2006, Congress recodified Title 46 of the U.S. Code, and COGSA was uncodified but reprinted at 46 U.S.C. § 30701, historical and statutory notes." Caddell Constr. Co. (DE), LLC v. Danmar Lines Ltd., 2018 WL 6726549, at *3 n.1 (S.D.N.Y. Dec. 20, 2018) (Stanton, J.) (citing Pub. L. No. 109-301; 120 Stat. 1485 (2006)); see also Rexroth v. Hydraudyne B.V. v. Ocean World Lines, Inc., 547 F.3d 351, 354 n.2 (2d Cir. 2008) (noting recodification and lack of substantive changes).  The Court cites to the COGSA sections as reflected in the statutory notes to 46 U.S.C. § 30701.

additional protection."  Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing, 167 F.3d 99, 101 (2d

Cir. 1999); see also Gen. Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1028 (2d Cir. 1987).

Hartford urges that Klearwall was not presented with a copy of Maersk's bill of lading until after

the shipment was delivered, and therefore did not have fair notice of Maersk's limit of liability.

   The bills of lading identify non-party Interocean as the shipper and Klearwall is

not named in the bills of lading.  (Chiarelli Dec. Ex. D.)  It is undisputed that Albatrans retained

Interocean to book ocean transit, and that Interocean then retained Maersk to provide ocean

carriage.  (Albatrans 56.1 ¶¶ 6-7; Pl. 56.1 Resp. ¶¶ 6-7.)  The bills of lading accordingly reflect

that Interocean is the shipper and that Albatrans is the consignee and party to be notified.

(Chiarelli Dec. Ex. D.)  The lower-left corner of the bills of lading contains a box that reads:

"Declared Value Charges (See Clause 7.3 of the MAERSK LINE BILL OF LADING) for

Declared Value of U.S. $".  (Id.)  No declared value was entered.  (Id.)

   Hartford does not point to evidence that would permit a reasonable trier of fact to

conclude that Klearwall was the shipper, as opposed to Interocean, and that Klearwall was

therefore entitled to a fair opportunity to declare a higher value on the bills of lading.  Its

unsupported factual statement is inconsistent with the bills of lading and otherwise unsupported

in the summary judgment record.

   The Court therefore concludes that the fair opportunity doctrine does not defeat

Maersk's summary judgment motion.

   B.  As the Summary Judgment Movant, Maersk Has Not Satisfied Its Burden to
     Demonstrate that the Parties Agreed to Treat the "Containers" as "Packages."

   Maersk's motion principally seeks a ruling from the Court that its damages are

limited to $1,000, on the basis that the Maersk bills of lading identify only two "packages," each

of which COGSA limits to $500 in damages.  In Maersk's view, the parties expressly agreed that

the "containers" identified in the bills of lading are packages.  In opposition, Hartford urges that the bills of lading identify a total of 262 "pieces" in the shipment, each of which should constitute a "package" under COGSA.

For the reasons that will be explained, Maersk has not come forward with evidence that the parties agreed that the "containers" constituted "packages."   Hartford has not moved for summary judgment on its own behalf, and the question of how many "packages" were in the shipment is appropriately resolved by a trier of fact.  Maersk's summary judgment motion will therefore be denied.

COGSA was enacted "'to facilitate efficient contracting in contracts for carriage by sea.'"  Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, 99 (2010) (quoting Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 29 (2004)).  "COGSA . . . allocates the risk of loss for cargo damaged during international transportation under contracts evidenced by bills of lading."  Stolt Tank Containers, Inc. v. Evergreen Marine Corp., 962 F.2d 276, 279 (2d Cir. 1992) (emphasis in original).

As noted, section 4(5) of COGSA provides that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States . . . ."  COGSA does not define the term "package," and "[m]yriad courts have struggled with what a COGSA package is."  Orient Overseas Container Line, Ltd. v. Sea-Land Serv., Inc., 122 F. Supp. 2d 481, 486 (S.D.N.Y. 2000) (Haight, J.).  The Second Circuit has described "package" as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods."  Aluminios Pozuelo Ltd. v. S. S.

Navigator, 407 F.2d 152, 155 (2d Cir. 1968).  This definition excludes certain types of cargo, like "loose liquids, potatoes, or fish," but "is still broad enough to include a wide range of other items, such as a boxed roll of steel weighing 32 1/2 tons or materials lashed to skids or pallets." Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam, Her Engines, Boilers, Etc., Nedlloyd Lijnen B.V. (Nedlloyd Lines), 759 F.2d 1006, 1012 (2d Cir. 1985).

In determining the parties' understanding of what constitutes a "package," courts "begin with a bill of lading's use of the term 'package,' and will adopt the unit of packaging unambiguously identified in the bill of lading.  In the event of ambiguity, we look elsewhere in the bill of lading and to other evidence of the parties' intentions."  Seguros Illimani S.A. v. M/V Popi P, 929 F.2d 89, 94 (2d Cir. 1991) (internal citations omitted); see also Binladen, 759 F.2d at 1012 ("Entries on the bill of lading are thus important evidence of the intent of the parties to the shipping contract, and the declaration on the bill may bind a shipper even when the contents of the shipment diverge from the description on the bill.") (internal citations omitted).  However, "bills of lading are contracts of adhesion and, as such, are strictly construed against the carrier." Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 482 (2d Cir. 1985).

In reviewing the terms of a bill of lading, the Second Circuit has emphasized the difference between a "container" and a "package," and noted the "distinct analyses for container and non-container cases."  Monica Textile Corp. v. S.S. Tana, 952 F.2d 636, 640 (2d Cir. 1991). "[T]he prevalent large metal shipping container furnished by a carrier is functionally part of the ship, and classification of it as a 'package' would violate the purpose of § 4(5) by permitting the carrier to limit its liability unduly . . . ."  Binladen, 759 F.2d at 1012-13 (internal citation and quotation marks omitted).  "[I]n container cases we must take a critical look at clauses purporting

to define the container as the COGSA package.  Accordingly, we have consistently cast a jaundiced eye upon language purporting to embody such an agreement."  Monica Textile, 952 F.2d at 641 (interior citation omitted).  "[W]hen a bill of lading refers to both containers and other units susceptible of being COGSA packages, it is inherently ambiguous," and that ambiguity is resolved against the carrier.  Id. at 642.

Courts will, however, treat a container as a package "'when the bill of lading expressly refers to the container as one package, or when the parties fail to specify an alternative measure of the 'packages' shipped . . . .'"  Binladen, 759 F.2d at 1015 (quoting Allied Int'l Am. Eagle Trading Corp. v. S.S. Yang Ming, 672 F.2d 1055, 1061 (2d Cir. 1982)).  "[I]f the bill of lading lists the container as a package and fails to describe objects that can reasonably be understood from the description as being packages, the container must be deemed a COGSA package."  Id.  Binladen explained:

> When a bill of lading specifies the number of containers but does not reveal the number of packages inside, the only certain figure known to both parties is the number of containers being shipped.  In such event the carrier cannot be charged with knowledge of whether the container is filled with packages, with unpackaged goods, or with some combination.  The carrier should not be expected to assume the risk inherent in such uncertainty, facing liability that might vary by orders of magnitude depending on the exact packaging of goods inside a sealed container, even though this information was not revealed to it by the bill of lading.

Id.  "We accordingly hold that, when the bill of lading does not clearly indicate an alternative number of packages, the container must be treated as a COGSA package if it is listed as a package on the bill of lading and if the parties have not specified that the shipment is one of 'goods not shipped in packages.'  Maximum damages in such a situation then are $500 per container, irrespective of the contents."  Id. at 1015-16.

In this case, the two bills of lading stated that the shipments were carried in two containers.  The bills of lading contained boxes in the lower-left corners titled, "Carrier's Receipt.  Total number of containers or packages received by Carrier."  (Chiarella Dec. Ex. D.) Both boxes had entries reading "1 container."  (Id.)

The two bills of lading also list the number of "pieces" in the shipment.  A text box labeled "PARTICULARS FURNISHED BY SHIPPER" contains the heading "Kind of Packages; Description of goods; Marks and Numbers; Container No./Seal No."  (Id.)  The entry in the first bill of lading states:

> SHIPPED ON BOARD BGF FEEDER 6TX – 1710 ON 2017-02-02 AT Cork, Co Cork
> 1 Container Said to Contain 102 pieces
> WINDOWS AND DOORS
> SCAC ABTB
> HWB ITNCJS002638
> MSKU4769869 45 DRY 9'6 102 pieces 10438.628 KGS 25.000 CBM
> Shipper Seal: 068541
> SHIPPER'S LOAD, STOW, WEIGHT AND COUNT
> FREIGHT COLLECT
> CY/CY

The second bill of lading contains the same labels and headings.  The entry states:

> SHIPPED ON BOARD BGF FEEDER 6TX – 1710 ON 2017-02-02 AT Cork, Co Cork
> 1 Container Said to Contain 160 PIECES
> WINDOWS AND DOORS
> MSKU4746610 45 DRY 9'6 160 PIECES 11918.262 KGS 25.000 CBM
> Shipper's Seal : 0243324
> SHIPPER'S LOAD, STOW, WEIGHT AND COUNT
> FREIGHT COLLECT
> CY/CY

(Id.)  Thus, under the heading for "Kind of Packages; Description of goods . . ." the bills of lading both identify "1 Container," in addition to a total number of "pieces" in a shipment of windows and doors.  (Id.)

The Terms of Carriage that accompany the bills of lading do not define the words "pieces" or "package," but they define "Container" to "include[] any container (including an open top container), flat rack, platform, trailer, transportable tank, pallet or any other similar article used to consolidate the Goods and any connected equipment."  (Wang Dec. Ex. 2.)

In scrutinizing bills of lading that identify both "pieces" and a "container," courts give attention to the text of the bill of lading, as well as the types of cargo at issue and extrinsic evidence of how the cargo was actually packed and prepared.  "The fact that the term 'pieces' is used to describe plaintiff's cargo can cut either way.  Depending upon the circumstances, courts have regarded pieces as COGSA packages." Transatlantic Marine Claims Agency, Inc. v. M/V MASON LYKES, 1993 WL 119780, at *3 (S.D.N.Y. Apr. 9, 1993) (McKenna, J.). Transatlantic Marine concluded that the sixteen "pieces" in a shipment that contained printing presses and spare parts were individual packages when the bills of lading identified "3 pieces," "4 pieces," "6 pieces" and "3 pieces" shipped in separate containers.  Id. at *2-3.  It noted the Second Circuit's reluctance to treat a container as a package and the absence of factual dispute that the pieces were wrapped in clear plastic, even though the bill of lading did not describe such a preparation.  Id. at *4.

In Marisa v. M/V CMA La Tour, 2006 WL 2521269, at *3 (S.D.N.Y. Aug. 29, 2006), Judge Buchwald was confronted with a bill of lading similar to the one at issue in this case: One text box had the entry of "1" under the caption "Total No. of Containers/Packages," and a separate box identified one container "said to contain 74 items household goods" under the caption "Number and kind of packages; description of goods."  Judge Buchwald denied the shipper's motion for summary judgment that sought to treat the container as a single COGSA package, stating that "as a matter of common sense, it is difficult to believe that any carrier

would think that '74 items household goods' referred to unpackaged goods," and noting that there was some "evidence tending to suggest" that the individual items had been boxed and wrapped.  Id. at *4-5.

Judge Sweet reached a different conclusion in Mapfre Atlas Compania de Seguros S.A. v. M/V LOA, 2017 WL 3332234 (S.D.N.Y. Aug. 3, 2017).  In Mapfre, a "No. of Pkgs." column in the bill of lading listed "1," and a "Description of Packages and Goods" column listed one container with 989 "pieces" of computer parts.  Id. at *4.  Judge Sweet noted that in Transatlantic, it was undisputed that the "pieces" were "packed/wrapped in clear plastic" and divided among different shipping containers.  Id.  In Mapfre, there was no evidence as to how the items were prepared, aside from a photograph allegedly showing that the items were boxed before being placed in a shipping container.  Id.  Judge Sweet concluded that neither the face of the bill of lading nor extrinsic evidence indicated how the individual pieces were packaged, and instead expressly identified a single container that carried a specific number of items.  Id. at *5.

As noted, bills of lading are strictly construed against the carrier, and a container is not considered a "package" unless the bill of lading expressly indicates the parties' agreement to do so.  Here, the bills of lading do not include express language that reflects an agreement to treat a container as a package.  The box in the lower-left corner of the bills of leading is headed, "Carrier's Receipt.  Total number of containers or packages received by Carrier," and each bill of lading lists "1 container."  (Chiarella Dec. Ex. D.)  The bill of lading uses the disjunctive "or" to distinguish a container from a package, and it expressly identifies "1 container," with no mention of packages.  The bill of lading separately identifies the number of "pieces" contained in each container, under the heading "Kind of Packages; Description of goods; Marks and Numbers; Container No./Seal No."  (Id.)  They describe the contents as "1 Container Said to

Contain 160 PIECES" and "1 Container Said to Contain 102 pieces," respectively.  (Id.)  Thus, the bills of lading identify the use of containers, but they do not expressly identify the containers as packages.  The number of "pieces" contained in the shipment, by contrast, "can reasonably be understood from the description as being packages . . . ."  Binladen, 759 F.2d at 1015.

Further, the definition of "Container" in the Terms of Carriage does not appear to encompass a preparation for transportation that was made to facilitate handling, as required for a "package."  See Aluminios Pozuelo, 407 F.2d at 155.  It broadly defines a "Container" as "any container . . . used to consolidate the Goods . . . ." and provides certain examples.  (Wang Dec. Ex. 2.)  This definition describes a larger "container" that "consolidate[s]" the shipment of goods, with no suggestion that it serves to facilitate the handling of items.

In addition, while the Court need not review extrinsic evidence to deny Maersk's motion, it bears noting that there are disputed facts as to how the shipment was prepared. Hartford asserts that each item was individually packed with adhesive films and separated and secured with cardboard, plywood or other protective materials, and points to photographs that purport to show as much.  (Evans Dec. ¶ 15 & Ex. E; Scollard Dec. ¶¶ 4-8.)  Maersk cites to deposition testimony from a witness who described the items as unpackaged and unsecured. (Bruno Dep. 43-44.)

The bills of lading do not reflect an express agreement between the parties to treat a "container" as a "package," and the "pieces" identified in the bills of lading can reasonably be understood from the description as being "packages."  See Binladen, 759 F.2d at 1015.  Because

Maersk has not come forward with evidence demonstrating that it is entitled to judgment in its favor, its motion for summary judgment will therefore be denied.[4]

      II.     <u>Albatrans's Motion Will Be Granted.</u>

Albatrans moves for summary judgment in its favor as to its liability.  Count One of the Complaint asserts that Albatrans is liable under COGSA as a carrier, NVOCC, and/or a freight forwarder.  Albatrans urges that it acted solely as a forwarding entity and that it was neither a common carrier nor a NVOCC.  It urges that it cannot be liable under COGSA as a freight forwarder, and that without evidence of its own negligence, it cannot be liable for damage to the shipment.  In opposition, Hartford urges that Albatrans acted as a NVOCC.

As will be discussed, Albatrans has come forward with evidence that its responsibilities were those of a freight forwarder.  In opposition, Hartford does not point to evidence that would permit a reasonable trier of fact to conclude that Albatrans acted as a NVOCC.  Albatrans's motion will therefore be granted.

COGSA provides for increased liability when an intermediary acts as a NVOCC but not when it acts as a freight forwarder.  "Freight forwarders and [NVOCCs] are types of intermediaries that arrange for shippers the transportation of cargo aboard a vessel.  Although they perform similar roles, the legal status of the intermediary determines its liability to the shipper." <u>Scholastic Inc. v. M/V KITANO</u>, 362 F. Supp. 2d 449, 455 (S.D.N.Y. 2005) (Chin, J.).  "Often when the status of an intermediary as NVOCC or freight forwarder is disputed, the intermediary argues for freight forwarder status and its limited liability, while the plaintiff argues for NVOCC status and increased liability arising from the bill of lading." <u>Id.</u> at 458.

---

[4] Maersk urges that, alternatively, "if the Court finds that the Containers and 'pieces' are not COGSA packages," it ought to treat the shipment as "goods not shipped in packages" under COGSA section 4(5), and limit its liability to $1,000.  The Court makes no factual findings in deciding this summary judgment motion and need not address this alternative argument.

The Second Circuit has analogized the role of a freight forwarder to that of a travel agent.  Prima U.S. Inc. v. Panalpina, Inc., 223 F.3d 126, 129 (2d Cir. 2000).  It "simply facilitates the movement of cargo to the ocean vessel."  Id.  It "'secure[s] cargo space with a steamship company, give[s] advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arrange[s] to have the cargo reach the seaboard in time to meet the designated vessel.'"  Id. (quoting New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Comm'n, 337 F.2d 289, 292 (2d Cir. 1964)).  Freight forwarders are "vitally different from carriers, such as vessels, truckers, stevedores or warehouses, which are directly involved in transporting the cargo.  Unlike a carrier, a freight forwarder does not issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped."  Prima, 223 F.3d at 129.  "As long as the freight forwarder limits its role to arranging for transportation, it will not be held liable to the shipper."  Id.  "[W]hen a freight forwarder selects someone to perform transportation services, that selection fulfills the forwarder's obligations in the absence of proof that the selection itself was negligent."  Id. at 130.

In contrast to a freight forwarder, "[t]he job of a [NVOCC] is to consolidate cargo from numerous shippers into larger groups for shipment by an ocean carrier."  Id. at 129.  The NVOCC is "a middleman that does not own and operate its own vessels.  Instead, it enters into service contracts whereby it purchases large blocks of cargo space at a discount from vessel-operating common carriers (VOCCs).  It then contracts with shippers to ship smaller amounts of cargo in that space."  Royal & Sun All. Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 141 (2d Cir. 2010).  The "NVOCC – as opposed to the actual ocean carrier transporting the cargo – issues a bill of lading to each shipper.  If anything happens to the goods during the voyage the

NVOCC is liable to the shipper because of the bill of lading that it issued."  Prima, 223 F.3d at 129.

The relevant facts are undisputed, although the parties differ on their characterization and legal significance.  Klearwall retained Albatrans to act as its inbound customs broker, and Albatrans also arranged for the ocean transport of the cargo and its ground-based transport from the Port of Newark to Connecticut.  (Albatrans 56.1 ¶¶ 3-5, 9-10, 14; Pl. 56.1 Resp. ¶¶ 3-5, 9-10, 14.)  Munster Joinery in Ireland packed and loaded the cargo container. (Albatrans 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Albatrans retained Interocean to book ocean transit, and Interocean, in turn, retained Maersk to transport the shipment.  (Albatrans 56.1 ¶¶ 6-7; Pl. 56.1 Resp. ¶¶ 6-7.)  Interocean and Maersk each issued bills of lading.  (Chiarelli Dec. Exs. C, D.) There is no assertion that Albatrans issued a bill of lading.  Albatrans arranged for Sapsan to provide for the shipment's inland transport from the Port of Newark to a Connecticut warehouse. (Albatrans 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)  There is no assertion that Albatrans and Klearwall entered into a written agreement that reflected an understanding as to whether Albatrans was to function as a NVOCC or freight forwarder.  (See Opp. Mem. at 12.)

In opposition to the motion, Hartford notes that Albatrans is registered with the Federal Maritime Commission to provide services as both a freight forwarder and a NVOCC. (Selvaggio Dec. Ex. B.)  But the fact that Albatrans is registered as a NVOCC, as well as a freight forwarder, does not in itself support the proposition that it performed as a NVOCC in this shipment.  Hartford also describes Interocean, which issued a waybill for the shipment, as Albatrans's "agent," and attributes certain actions to Albatrans "and/or" Interocean.  (Opp. Mem. at 3-4, 10; Evans Dec. ¶¶ 6, 9.)  Hartford does not point to any evidence to support its argument that the acts of Interocean can be imputed to Albatrans, however, or expressly assert that

Interocean is the alter ego of Albatrans.  Hartford's vague, unsupported characterizations of the relationship between Albatrans and Interocean do not defeat the Albatrans motion.

Hartford also urges that, as a matter of law, Albatrans could not have acted as a freight forwarder because the Shipping Act of 1984 defines a "freight forwarder" in the context of exports only, and the shipment at issue was an import.  See 46 U.S.C. § 40102(19)(A) ("The term 'ocean freight forwarder' means a person that in the United States, dispatches shipments from the United States via a common carrier and books or otherwise arranges space for those shipments on behalf of shippers.").  But the Shipping Act is distinct from COGSA, and Hartford does not explain why the Shipping Act's definition would control.  See, e.g., In re M/V Rickmers Genoa Litig., 622 F. Supp. 2d 56, 68-69 (S.D.N.Y. 2009) ("I am reluctant to adopt Shipping Act definitions for purposes of interpreting  COGSA terms because the Shipping Act limits the applicability of its definitions elsewhere.") (Preska, J.).  Moreover, the Second Circuit has treated intermediaries as freight forwarders in the import context.  Prima, 224 F.3d at 129 (concluding that firm acted as a freight forwarder for shipment from Italy to Iowa).

In opposing Albatrans's motion, Hartford has not pointed to evidence that would permit a reasonable trier of fact to conclude that Albatrans functioned as a NVOCC or otherwise had responsibilities that place it within the ambit of COGSA.  First, there is no assertion that Albatrans issued a bill of lading.  While not dispositive in itself, this weighs heavily against Albatrans's status as a NVOCC.  See, e.g., Prima, 223 F.3d at 129 (defendant was not a NVOCC when it "did not issue a bill of lading and it did not consolidate cargo."); Indem. Ins. Co. of N. Am. v. Expeditors Int'l of Washington, Inc., 2019 WL 6842073, at *3 (S.D.N.Y. Dec. 16, 2019) ("Whether a bill of lading is issued is just one factor of the analysis.") (Oetken, J.); Oparaji v. Atl. Container Line, 2008 WL 4054412, at *5 (S.D.N.Y. Aug. 28, 2008) (noting "industry

custom" that NVOCCs issue bills of lading) (Lynch, J.).  Hartford also does not point to

evidence that Albatrans consolidated cargo for shipment.  Prima, 223 F.3d at 129.  Hartford also

does not point to evidence that Albatrans supervised the physical preparation of the shipment or

that Klearwall expected Albatrans to be on site at any point in the shipment.  See id. at 128.

Indeed, Hartford itself explains that Klearwall and Munster Joinery were responsible for packing

the shipment.  (Opp. Mem. at 4-6.)  Hartford does not identify actions or responsibilities of

Albatrans that would permit a reasonable trier of fact to conclude that Albatrans was a NVOCC.

Albatrans has therefore come forward with evidence that its role was limited to

that of a freight forwarder.  In opposition, Hartford has not come forward with evidence that

would permit a reasonable trier of fact to conclude that Albatrans acted as a NVOCC.

Albatrans's motion will therefore be granted.

CONCLUSION

For the reasons explained, Maersk's motion for summary judgment is DENIED.

(Docket #83.)  Albatrans's motion for summary judgment is GRANTED.  (Docket #97.)  The

Clerk is directed to terminate the motions and the related letter-motion.  (Docket #92.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 11, 2021

- 18 -