UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HARTFORD FIRE INSURANCE CO., as
subrogor of Klearwall Industries, Inc.,

                              Plaintiff,                              18-cv-121 (PKC)

          -against-                                          FINDINGS OF FACT
                                                        AND CONCLUSIONS OF LAW

MAERSK LINE, a division of the A.P. Moller-
Maersk Group,

                              Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Klearwall LLC ("Klearwall") is a firm that designs and imports glass windows

and doors.  In March 2017, a shipment of doors and windows sent from the Munster Joinery in

Cork, Ireland arrived at a Klearwall facility in damaged and unusable condition.  Defendant

Maersk Line ("Maersk") provided ocean carriage of the shipment from Cork to the Port of

Newark, at which point the shipment's two cargo containers were discharged from the Maersk

vessel and transported to a Klearwall facility in Connecticut by a trucking firm, Sapsan LLC

("Sapsan").

          Hartford Fire Insurance Co. ("Hartford") brings a claim against Maersk, as

subrogor of Klearwall, under the Carriage of Goods by Sea Act, 46 U.S.C. § 30701

("COGSA").[1]  The Court held a bench trial of this action on October 21, 2021.  Hartford called

---

[1] "COGSA was previously codified at 46 U.S.C. §§ 1300-1315. In 2006, Congress recodified Title 46 of the U.S. Code, and COGSA was uncodified but reprinted at 46 U.S.C. § 30701, historical and statutory notes." Caddell Constr. Co. (DE), LLC v. Danmar Lines Ltd., 2018 WL 6726549, at *3 n.1 (S.D.N.Y. Dec. 20, 2018) (Stanton, J.) (citing Pub. L. No. 109-301; 120 Stat. 1485 (2006)); see also Rexroth v. Hydraudyne B.V. v. Ocean World Lines, Inc., 547 F.3d 351, 354 n.2 (2d Cir. 2008) (noting recodification and lack of substantive changes).

four witnesses at trial and Maersk called one witness  (Docket # 113-15, 120, 123.)  Both parties

waived cross-examination.  In addition, Maersk offered the deposition testimony of Klearwall's

surveyor, Nicholas Bruno, that was received into evidence over Hartford's objection.[2]  (Docket #

118.)  Between the two sides, thirteen exhibits were received into evidence.  (PX A through PX

I-2; DX 1 through DX 3.)

        For the reasons that will be explained, the Court concludes that Hartford has not

made a prima facie case that the cargo was delivered to Maersk in good order and condition or

that the cargo was damaged at the time of its outturn by Maersk.  Even if Hartford had made a

prima facie case, Maersk has proved by a preponderance of the evidence that the cargo's damage

was caused by the insufficiency of packing, which is a statutory exemption to liability under

COGSA, and that Hartford has not shown contributing fault or neglect on the part of Maersk.

Judgment will therefore be entered for Maersk.

        The following are the Court's findings of fact and conclusions of law.  See Rule

52(a)(1), Fed. R. Civ. P.[3]

FINDINGS OF FACT.

        1.     Plaintiff Hartford is the subrogor of Klearwall.  (Sartore Dec. ¶ 3 & Ex.

A.)  Klearwall designs and imports glass windows and doors.  (Evans Dec. ¶ 2.)

        2.     Since in or about 2011, the Munster Joinery in Ireland has manufactured

windows and doors for Klearwall.  (Evans Dec. ¶¶ 4, 8, 15.)  Approximately 200 Klearwall

---

[2] Hartford has complained that Maersk did not call Hartford's subrogee's retained surveyor as a live witness at trial, thus affording it an opportunity to cross-examine him beyond the opportunity afforded at the deposition.  But as the Court noted in a written Order of July 22, 2021 (Docket # 131), Hartford failed to object in the Joint Pre-Trial Order to the admission of the deposition testimony of Bruno and, thus, waived any objection.  The Court nevertheless allowed Hartford to call Bruno at trial even though it had not previously designated him, but it elected not to do so.
[3] Any finding of fact improperly designated as a conclusion of law or vice versa, should be considered under its proper designation.

shipments have since been sent from Ireland to destinations in the United States and Canada. (Evans Dec. ¶ 16.)

3.       On or about March 2, 2017, a shipment of glass windows and doors that originated from the Munster Joinery arrived in damaged and unusable condition to a Klearwall facility in Connecticut.  (Hughes Dec. ¶ 10; DX 3.)  Defendant Maersk provided the shipment's ocean carriage from Cork, Ireland to Newark, New Jersey.  (PX B; Wang Dec. Exs. 3, 4.)

4.        Maersk had no role in the transportation of the closed containers from the Munster Joinery to the Port of Cork nor from the Port of Newark to Klearwall's facility in Connecticut. No evidence has been offered that the sealed containers were inspected by Maersk upon arrival at the Port of Cork nor is there any evidence that they were inspected by anyone at outturn in the Port of Newark.

5.       The Munster Joinery packed and loaded the glass windows and doors into two cargo containers.  (Hughes Dec. ¶¶ 1-2; Scollard Dec. ¶ 1.)  The containers were supplied by Maersk and were approximately 45 feet long.  (Wang Dec. ¶ 6.)

6.       The two containers were loaded onto a vessel for ocean carriage by Maersk out of Cork on February 2, 2017.  (Wang Dec. ¶ 9 & Exs. 3, 4.)  On February 5, 2017, the containers were discharged at a port in Rotterdam, and on February 12, 2017, were loaded onto another ocean vessel for transport to the Port of Newark.  (Wang Dec. ¶ 9 & Exs. 3, 4.)  The containers were discharged from the vessel at the Port of Newark on February 23, 2017, and left the Port Newark Container Terminal on March 1, 2017 for overland trucking to Connecticut by Sapsan.  (Wang Dec. ¶ 9 & Exs. 3, 4.)

7.      A Maersk bill of lading was issued for each of the two containers.  (PX B.)
Under the heading, "PARTICULARS FURNISHED BY SHIPPER," the first bill of lading stated
in part:

> 1 Container said to contain 160 PIECES
> WINDOWS AND DOORS
> MSKU4746610 45 DRY 9'6 160 PIECES 11918.262 KGS 25.000 CBM
> SHIPPER SEAL : 0243324
> SHIPPER'S LOAD, STOW, WEIGHT AND COUNT

(PX B.)  Under the same heading, the second bill of lading stated in part:

> 1 Container Said to Contain 102 pieces
> WINDOWS AND DOORS
> MSKU4769869 45 DRY 9'6 102 pieces  10438.628 KGS 25.000 CBM
> Shipper Seal : 068541
> SHIPPER'S LOAD, STOW, WEIGHT AND COUNT

(PX B.)  Klearwall valued the shipment at $306,760.02.  (Hughes Dec. ¶ 3; Sartore Dec. Ex. A.)

8.      Upon the containers' arrival in Connecticut, Chris Hughes, the service
manager at Klearwall, observed extensive damage to the shipment's glass doors and windows.
(Hughes Dec. ¶¶ 10-11.)  He states that "it looked like somebody just picked up the container
and shook it side to side up and down and forward and backward, the boxes were crushed, the
straps were ripped through the A-frame and the windows.  . . .  The sides and even the roof of the
container were pushed out and must have been subjected to extreme force."  (Hughes Dec. ¶¶ 10-
11.)  Nicholas Bruno, a surveyor retained by Klearwall, estimated that 80% of the shipment's
windows had sustained damage.  (DX 3.)  Klearwall did not use the remaining 20% of shipped
items.  (DX 3.)

9.      It is undisputed that the shipments were prepared, packed and loaded
under the direction and supervision of the Munster Joinery in Ireland.  Brendan Scollard has the
job title of Despatch Manager – International Orders at Munster Joinery.  (Scollard Dec. ¶ 2.)  He

- 4 -

states that he is familiar with the packing and loading process used at Munster Joinery for Klearwall's shipments.  (Scollard Dec. ¶ 2.)

10.     Scollard has testified as to the general practices for packing and loading Klearwall's shipments.   He states that heavy cardboard corner guards are attached to each item, and that a quarter-inch plywood sheet cut to each item's width is screwed to the bottom of each window or threshold.  (Scollard Dec. ¶ 4.)  The items are individually stacked into an A-frame made of solid plywood construction, with cardboard separating each unit.  (Scollard Dec. ¶ 5.) The items are secured by straps.  (Scollard Dec. ¶ 6.)  Dunnage is placed between the walls of the container and the A-frames.  (Scollard Dec. ¶ 7.)

11.     Scollard describes the general practices of Munster Joinery for loading Klearwall shipments but his testimony about the two containers and their contents is limited. Scollard states that he "was present" for the containers' loading.  (Scollard Dec. ¶ 1.)  He states, "When I observed the two containers at issue upon packing and loading, the windows and doors packed and loaded for shipment to Klearwall were in good order and condition."  (Scollard Dec. ¶ 8.)  Scollard further states that during eight years of using these same packing and loading procedures, the two disputed containers are the only ones to suffer damage in transit.  (Scollard Dec. ¶ 9.)

12.     Scollard has merely stated that he was "present" and "observed" the packing and loading of the containers.  (Scollard Dec. ¶¶ 1, 8.)  He does not assert that he supervised or managed the cargo's preparation or was personally involved in securing the items. He does not explain the scrutiny or inspection that he gave to the cargo or testify that he physically reviewed it.  He testifies that the windows and doors "were in good order and condition" but offers no supporting details.  Scollard's testimony is consistent with a superficial

visual observation from afar.  He otherwise describes the general practices used at Munster

Joinery for packing and securing items shipped to Klearwall.  (Scollard Dec. ¶¶ 2-7, 9.)

13.      Hartford has submitted the May 3, 2021 declaration of Chris Hughes, who

is Klearwall's Service Manager.  He testified that "The windows and doors shipped to Klearwall

from Munster Joinery are prepared as individual units for shipment." (Hughes Dec. ¶ 5.)  "Each

individual unit then gets a 1/4" piece of plywood cut to the exact width and is screwed to the

bottom of the window or threshold under each unit." (Hughes Dec. ¶ 6.)  "As the order is being

put together the windows or doors would be stacked individually one by one on an A frame.

Cardboard goes over the plywood on the back side and a sheet of cardboard is placed between

and separating each and every unit." (Hughes Dec. ¶ 7.)  Much of the Hughes Declaration is

lifted nearly word-for-word from the Scollard Declaration.  (E.g., compare Hughes Declaration

¶¶ 5, 7, 8 with the Scollard Declaration ¶¶ 3, 5, 6.)  Of significance, no claim is made that anyone

associated with Klearwall, including Hughes, was present at the Muenster Joinery when the

goods were loaded into containers.  His testimony appears to be nothing more than second-hand

information.

14.      The Evans Declaration fares no better.  The shipment at issue was sent in

or about February 2017.  Yet Evans claims only that "In 2011, I was engaged as a consultant to

Klearwall Industries, LLC (Klearwall) in the United States . . . ." (Evans Dec. ¶ 3.)  He makes

no claim that he was in Ireland at or about the time of the shipment.  Other evidence offered by

Hartford is similarly general and not related to the shipment at issue.  Plaintiff's Exhibit I-1 and

Exhibit E to the Evans Declaration purport to show photographs of "the shipment as it was

loaded at the origin," but Evans identifies these same photos as "example photographs." (Evans

Dec. ¶ 15.)  The photos reflect rear images of a container that appears to be loaded with tall,

narrow, vertical items, packaged in cardboard and plywood and secured by blue straps.  (Evans

Dec. Ex E & PXI-1.)  Four photos are attached at Exhibit E to the Evans Declaration, while

Plaintiff's Exhibit I-1 consists of the same four photos and three additional ones.  Hartford has

not provided a date when the photos were taken or explained their origins.  Moreover, Evans is

employed at Klearwall in the United States but the photos annexed to his declaration purport to

be taken at the Munster Joinery in Ireland.  Because they are identified as "example

photographs" and not photos of the cargo at issue, they are not evidence of either the good order

and condition of the cargo in this case or of the cargo's packing and loading.

15.     Hartford has not offered other evidence about the condition of the cargo at

the time it was loaded into the containers for delivery to Maersk, such as witness testimony,

contemporaneous notes, or business records.

16.     A domestic trucking firm, Sapsan, transported the two containers from the

Port of Newark to the Klearwall facility in Connecticut.  (Evans Dep. p. 32.)  Hartford named

Sapsan and another entity, Albatrans, Inc., as defendants and asserted that "the damage to the

cargo occurred while in the possession of the defendants and each of them . . . ." (Docket # 28, ¶

14.)  In a Second Amended Complaint filed December 4, 2019 Hartford added a Carmack

Amendment Claim against Sapsan alone, alleging that it was liable for the "full, actual damages"

to the two containers.  (Docket # 45 ¶¶ 25-28.)  The Court dismissed all claims against Sapsan

for lack of personal jurisdiction.  Hartford Fire Ins. Co. v. Maersk Line, 2019 WL 4450639, at *1

(S.D.N.Y. Sept. 17, 2019).  On March 11, 2021, the Court granted summary judgment in favor of

Albatrans, Inc., finding that its role was limited to that of a freight forwarder.  Hartford Fire Ins.

Co. v. Maersk Line, 2021 WL 949755 (S.D.N.Y. Mar. 11, 2021).

17.     While alternative pleading is permitted, a party's pleading is a representation that, after reasonable inquiry, "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Rule 11(b)(3), Fed. R. Civ. P.  One year and nine months after the cargo arrived at Klearwall's Connecticut facility and eleven months after this action was filed, Hartford alleged that Sapsan, which picked up the sealed containers at the Port of Newark and transported them by truck to the Connecticut facility, was liable for the "actual, full value" under the Carmack Amendment, which permits an action to be filed "against the carrier alleged to have caused the loss or damage . . . ."  49 U.S.C. § 14706(d)(2).  The allegation was never withdrawn by Hartford but ceased to be operative when the action against Sapsan was dismissed by the Court.  The allegation is an admission by Hartford that as of December 4, 2018, it had a good-faith basis to believe that Sapsan caused the damage for which it seeks to hold Maersk liable.  Hartford has pointed to nothing new that it learned in the interim that undermined that belief.

18.     Hartford has not offered evidence about the condition of the cargo at the time that it was discharged by Maersk in Newark and came within the control of Sapsan.  (Evans Dep. p. 32.)  For example, while Hughes has testified that the sides of one container and its roof had been "pushed out" as if subjected to extreme force (Hughes Dec. ¶ 11), Hartford has not offered evidence that the container was so damaged at the time that it entered Sapsan's custody and control.

19.     Upon the discovery of the cargo damage, Klearwall retained Bruno, a surveyor employed by the National Cargo Bureau.  (DX 3; Bruno Dep. Tr. 11.)  Bruno reviewed

and documented "the stripping of cargo from two import containers with alleged cargo shift" on March 3 and 6, 2017.  (DX 3.)

20.     In a written summary of his findings, Bruno concluded that "[t]he cargo of windows was found to have shifted within the containers, causing damage to themselves due to contact with the container walls and ceilings . . . .   The condition of the cargo undoubtedly confirms that the cargo support and securing arrangement failed as the containers were subject to extreme movements and heavy forces while in transit, as would occur while stowed on a vessel in heavy seas."  (Id.)  Bruno's report states: "Support 'A' frames and pallets were found buckled, distorted and coming apart at joints."  (Id.)  The report also noted dents to the container that were consistent with "extreme" vertical movements that often occur when a vessel "surges and heaves" in rough waters.  (Id.)

21.     Bruno observed inadequacies as to how the cargo was braced, lashed and secured.  (Id.)  He stated that the A-frame pallets were not secured to the container and that lashings should have been used to prevent the cargo from sliding.  (Id.)  He also stated that T-braces should be used in addition to A-frames in order to prevent the A-frames from buckling.  (Id.)  Bruno stated that screws should be used to construct the A-frames instead of brad nails, and that blocking and bracing should be used to better secure cargo to the container walls.  (Id.)  He stated that the use of cardboard as "chaffing gear" contributed to the damage and that "a more durable material" should be used.  (Id.)  Bruno observed that certain "lashings had found to be parted" and that a third lashing should be used to secure the windows to the A-frame.  (Id.)

22.     Under the heading "Final Conclusion," Bruno stated that the containers "endured extreme movements and forces while in transport.  The supporting and bracing

structures as well as securing and lashing arrangements failed to provide adequate protection, and as a result the cargo suffered damage."  (Id.)

23.    As Hartford noted at trial, Bruno was not qualified as an expert and was not offered as an expert.  See Rule 702, Fed. R. Evid.  Bruno was, however, retained by Klearwall at or around the time the shipment was delivered to Connecticut.  In the Joint Pretrial Order, Maersk listed without objection Bruno's surveyor report and designations from his deposition transcript.  (Docket # 122.)  Bruno's observations and conclusions are persuasive evidence that Munster Joinery did not adequately pack and secure the cargo.

24.    James W. Wang, who has the job titled "Head of Claims, North America" at Maersk, testified that the containers were loaded and sealed at the time they were delivered to Maersk for ocean transport, and that Maersk had no personnel present when the containers were loaded and sealed.  (Wang Dec. ¶¶ 12-13.)

25.    The Maersk bills of lading also identify a shipper seal on each container. (PX B.)  This is additional evidence that the containers were sealed prior to their delivery to Maersk.

26.    Based on the testimony of Wang and the shipper seal listed on each bill of lading, the Court finds that when the containers were delivered to Maersk for ocean carriage, they were sealed and their contents were not available for inspection.

27.    The Court finds that after the shipment was delivered to Klearwall, the two containers were returned to Maersk and continued in service for the carriage of goods. (Wang Dec. ¶ 16 & Exs. 3, 4.)

28.    Maersk's role in the shipment concluded after the cargo was discharged in the Port of Newark.  (Wang Dec. Exs. 3, 4.)

CONCLUSIONS OF LAW.

1.    "In a COGSA cause of action a shipper 'who wishes to recover against the carrier for damage to goods bears the initial burden of proving both delivery of goods to the carrier . . . in good condition, and outturn by the carrier . . . in damaged condition.'" Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir. 1998) (quoting Vana Trading Co. v. S.S. "Mette Skou", 556 F.2d 100, 104 (2d Cir. 1977)).  A plaintiff must make out its prima facie case by a preponderance of the evidence.  Ferrostaal, Inc. v. M/V Tupungato, 230 Fed. App'x 11, 13 (2d Cir. 2007) (summary order).  "[T]he whole point of the prima facie requirements in COGSA . . . is to establish that the damage to the goods occurred while under the supervision of the defendant."  Transatlantic Marine, 137 F.3d at 99.

2.    At argument, Hartford conceded that "it is the obligation of the party delivering the container to Maersk to place the goods in the container in a manner in which they will not be damaged in ordinary ocean travel."  (Trial Tr. 19-20.)

3.    A plaintiff may make out a prima facie case in two "general ways." Transatlantic Marine, 137 F.3d at 98-99.  "First, the plaintiff may present direct evidence relating to the healthy condition of the goods at delivery and their damaged condition at outturn."  Id. at 98; see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 434 (2d Cir. 2005) ("a plaintiff must present evidence (a) that the cargo was damaged, and (b) that the damage occurred while the cargo was under the carrier's control and not because of 'any inherent vice of the cargo.'") (quoting Siderius v. M.V. "Amilla,", 880 F.2d 662, 664 (2d Cir. 1989)).  "Outturn" occurs when the carrier delivers the container to the shipper's agent.  Bally, Inc. v. M.V. Zim Am., 22 F.3d 65, 69 (2d Cir. 1994).

4.     "[T]he issuance of a clean bill of lading creates a presumption of delivery in good condition favorable to the plaintiff."  Transatlantic Marine, 137 F.3d at 98.  However, "where the contents of a shipment are not visible or open for inspection, as may be the case when cargo is transferred to the carrier in a sealed container, a clean bill of lading is not sufficient to establish delivery of the goods in good condition."  Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (collecting cases).  "Instead, when a carrier is prevented from independently inspecting cargo, the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo."  Id. at 84.  Even a "quite detailed" bill of lading does not suffice to demonstrate good condition if the container is sealed upon delivery.  Id.

5.     Hartford has not met its burden to show that the shipment of doors and windows were delivered to Maersk in good order and condition.  As discussed, the vague and generalized testimony of Scollard does not demonstrate by a preponderance of the evidence that the glass windows and doors were in good order and condition at the time of their delivery to Maersk.  (Scollard Dec. ¶¶ 1, 8.)  The testimony of Scollard, Evans and Hughes about Munster Joinery's general practices for packing and securing shipments to Klearwall are of little or no value because they do not describe the cargo in this case.  The near-identical wording in the testimony of Hughes and Scollard further weighs against their credibility.

6.     While a clean bill of lading may establish a presumption that cargo was tendered in good order and condition, the bills of lading fail to do so here because the containers were sealed when delivered to Maersk.  Security Ins. Co. of Hartford, 391 F.3d at 83-84.  The bills of lading reflect that the containers were sealed.  (PX B (notations of "Shippers Seal : 0243324" and "Shipper Seal : 068541").)  See Security Ins. Co. of Hartford, 391 F.3d at 84 ("the

bill of lading itself suggests that the cargo was sealed, as it twice bears the notation 'SEAL NO.

897999'").  The Court therefore concludes that the bills of lading do not demonstrate that the

cargo was delivered in good order and condition.

       7.    Additionally, while it is undisputed that the cargo was damaged and

unusable by the time it reached its final destination in Connecticut, Hartford has not offered

evidence of its condition at the time of outturn from Maersk.  After the cargo was discharged by

Maersk at the Port of Newark, it was trucked to Connecticut by Sapsan.  The trial record does not

include evidence about the cargo's handling by Sapsan, such as testimony from Sapsan that it

trucked the two containers without incident.  As noted, Hughes also testified that the body of one

cargo container was visibly damaged, with the sides and the roof "pushed out."  Hartford has not

offered evidence that such outwardly visible damage was also apparent to Sapsan at the time it

took custody of the containers at the Port of Newark.  See Bally, 22 F.3d at 69-71 (discussing

shipper's failure to show loss at the time of outturn by carrier).

       8.    The Court therefore concludes that Hartford has not shown by a

preponderance of the evidence that the cargo was in good order and condition at the time of

delivery to Maersk or that the cargo was damaged at the time of its outturn at the Port of Newark.

       9.    "The second way a plaintiff may discharge its burden of making out a

prima facie case under COGSA is to show that the characteristics of the damage suffered by the

goods justify the conclusion that the harm occurred while the goods were in the defendant's

custody."  Transatlantic Marine, 137 F.3d at 99.  For instance, evidence of seawater wetting may

"inexorably justif[y] the conclusion that the injury occurred at sea."  Id.; see also Siderius v.

M.V. Amilla, 880 F.2d 662, 664 (2d Cir. 1989) (evidence of "drip down on the cargo" and rust

were sufficient to make out a prima facie case that damage occurred while in the ocean carrier's custody).

10.    Hartford has not demonstrated that the nature of the cargo's damage is sufficient to attribute the harm to Maersk.  It also has not relied on this grounds when explaining its prima facie case.  There is no evidence that the damage occurred due to exposure to water or other elements associated with sea carriage.  At trial, counsel to Hartford speculated that the damage was necessarily caused by inclement weather on the high seas (Trial Tr. 20), but the record contains no evidence of the weather conditions during the cargo's ocean voyage.

11.    Even if Hartford had made a prima facie case, Maersk has proved by a preponderance of the evidence that the cargo was damaged because of its "insufficiency of package."  46 U.S.C. § 30706(b)(6), codified at PL 109–304, October 6, 2006, 120 Stat 1485.  If a plaintiff has made a prima facie case under COGSA, "the burden shifts to the defendant(s) to show that one of the statutory COGSA exceptions to liability exists."  Transatlantic Marine, 137 F.3d at 98.  "'[U]nder the policy of the law' the carrier must 'explain what took place or suffer the consequences.'"  Id. (quoting Associated Metals & Minerals Corp. v. M/V Arktis Sky, 978 F.2d 47, 51 (2d Cir. 1992)).  "Once a COGSA exception is established, the burden then returns to the shipper or consignee to 'show that there were . . . concurrent causes of loss in the fault and neglect of the carrier.'"  Vana Trading Co., 556 F.2d at 105 (quoting J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 588 (2d Cir. 1971)).  "Insufficiency of package" is one statutory exception to liability.

12.    The conclusions of Bruno are strong evidence that the glass windows and doors were insufficiently packaged at Munster Joinery.  As discussed, Klearwall itself retained Bruno, who recorded deficiencies in the cargo's packing methods and recommended additional

measures to secure future shipments.  Bruno's conclusions were supported by detailed factual

observations and an appendix of photographs.  Bruno's report is evidence that the cargo was

damaged as a result of insufficient packing and loading at Munster Joinery.

13.     The testimony of Evans, Hughes and Scollard about the typical packing

practices used at Munster Joinery and the history of shipping without incidents of damage are

afforded little weight because they do not describe the cargo shipped here.  Cf. Hartford Fire Ins.

Co. v. Expeditors Int'l of Washington, Inc., 2012 WL 2861433, at *7 (S.D.N.Y. July 9, 2012)

(second-hand knowledge of how cargo was "typically" packed was inadmissible and did not

defeat carrier's summary judgment motion directed toward insufficient packing) (Forrest, J.).

14.     The condition of the containers also supports the conclusion that any

damage to the cargo was a result of inadequate packing.  The containers were placed back in use

immediately upon their return to Newark and used in a shipment to China.  (Wang Dec. Exs. 3,

4.)  Bruno observed that "the two containers appeared to be in good condition with minor dents

on the ceiling and sides of the containers" and that the dents would not impede future use.  (DX 3

at 7.)  Hughes, by contrast, observed that the "sides and even the roof of the container were

pushed out and must have been subjected to extreme force."  (Hughes Dec. ¶ 11.)  Because the

containers were returned to use almost immediately, the weight of the evidence supports the

conclusion that the containers suffered only limited and superficial damage during the shipment,

a result that is more consistent with deficient packing and loading rather than the neglect or fault

of the carrier.

CONCLUSION.

The Court therefore concludes that Hartford has not established a prima facie

case, and that even if it had, the evidence adduced at trial demonstrates by a preponderance of

the evidence that the cargo was damaged by the insufficiency of package, and Hartford has not demonstrated a concurrent cause of loss in the fault and neglect of Maersk.  The Court finds by a preponderance of evidence in favor of Maersk.

        Sapsan LLC and Albatrans, Inc. having been previously dismissed by the Court, the Clerk shall enter final judgment for all defendants and close the case.

        SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      November 10, 2021